**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO**

v.

**OFFICE OF PERSONNEL MANAGEMENT, et al.**

**NATIONAL TREASURY EMPLOYEES UNION**

v.

**Loretta CORNELIUS, et al.**

**NATIONAL FEDERATION OF FEDERAL EMPLOYEES**

v.

**Loretta CORNELIUS, et al.**

Civ. A. Nos. 85–2092, 85–2101 and 85–2109.

United States District Court, District of Columbia.

Sept. 30, 1985.

William J. Stone, Washington, D.C., for AFGE.

Gregory O'Duden, Washington, D.C., for NTEU.

Edwin Harvey, Washington, D.C., for NFFE.

Richard Willard, Acting Asst. Atty. Gen., Dept. Justice, Civil Div., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

In these three consolidated cases unions representing federal civilian employees challenge the implementation of regula-

tions promulgated by the Office of Personnel Management ("OPM") which work major changes in the terms and conditions upon which federal employment is held, including such matters as reductions in force ("RIFs"), promotions, performance management systems, pay administration under the Fair Labor Standards Act ("FLSA"), and others.[1] The case is now before the Court on plaintiffs' motions for a preliminary injunction staying implementation of the regulations pending a decision on the merits of their legality. For the reasons set forth below the Court finds that plaintiffs have not made the showing required of them for preliminary injunctive relief under *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C.Cir.1958), and *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977), and their motions for preliminary injunction will, therefore, be denied.

## I.

The origins, including the judicial antecedents, of the present dispute are many and convoluted, and have engaged at various times the simultaneous attentions of all three branches of the government. The controversy began on March 30, 1983, when, as required by the APA, 5 U.S.C. § 553, OPM published in the Federal Register a proposed set of regulations governing federal civilian employment, the primary thrust of which was to exalt sustained high-quality performance over seniority as the principal criterion upon which promotions, pay, retention preferences, and the like would be dispensed. 48 Fed.Reg. 13,341 *et seq.* (1983). Having provoked the extensive commentary which might be expected, the proposed regulations were then revised and republished by OPM on July 14, 1983, and the public given an additional 30 days in which to comment again. 48 Fed.Reg. 32,279 *et seq.* (1983). Apparently still uneasy with the results, however, on

August 15, 1983, Congress enacted legislation prohibiting OPM from expending any funds "to adopt, to issue, or to carry out a final rule or regulation, a final revision, addition, or amendment to regulations, or a final statement of policy" in the matter. Department of Transportation and Related Agencies Appropriations Act, 1984, Pub.L. 98–78, § 323, 97 Stat. 453 (1983). The ban on spending expired on October 15, 1983, and Congress failed to renew it. Once again OPM put the regulations forth, publishing its intended final version in the Federal Register on October 25, 1983, to take effect on November 25, 1983. 48 Fed.Reg. 49,462–49,498 (1983). In the meantime, however, the House Appropriations Committee had reported H.R. 4139 making appropriations for the fiscal year ending September 30, 1984, for a number of federal agencies, including OPM, *see* H.R.Rep. No. 417, 98th Cong., 1st Sess. (1983), and contained within the bill was the so-called "Hoyer Amendment" providing:

> None of the funds appropriated under this Act shall be obligated or expended to implement, promulgate, administer, or enforce the proposed Office of Personnel Management regulations and the proposed Federal Personnel Manual issuances published in the Federal Register on March 30, 1983, ... as superseded by proposed regulations and Federal Personnel Manual issuances published in the Federal Register on July 14, 1983.

H.R. 4139 was passed by the House on October 27, 1983, with the Hoyer Amendment intact, two days after OPM had issued its third version of the regulations. The Senate never had an opportunity to act on H.R. 4139, for in early November, 1983, compelled by fiscal urgency, Congress resorted to a continuing resolution, H.J.Res. 413, the second for that year, in lieu of the customary appropriations process for funding government operations, and H.J.Res. 413 incorporated H.R. 4139, including the Hoyer Amendment. Pub.L. 98–151, 97

---

1. The Court has jurisdiction under 5 U.S.C. § 701 *et seq.*, and 28 U.S.C. §§ 1331, 1346(a)(2), 2201 and 2202 (1982). Review is sought pursu-

ant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706 (1982).

Stat. 964 (1983). Undaunted, on November 21, 1983, OPM announced that, notwithstanding H.J.Res. 413, the regulations would take effect as scheduled on November 25, 1985, because, being finished, no additional money would have to be spent on them.

Two weeks earlier, however, uncertain of the extent to which it could count on Congress for succor, National Treasury Employees Union ("NTEU"), one of plaintiffs here, had filed suit in this court seeking injunctive relief and a declaration that the regulations were "null and void." [2] Upon OPM's announcement of its intention to go forward with the regulations plaintiffs applied for and were granted a temporary restraining order staying their implementation, which was thereafter extended by agreement of the parties pending the court's decision on cross-motions for summary judgment.

On December 30, 1983, a judge of this court granted plaintiffs' motion for partial summary judgment, holding that Congress had intended H.J.Res. 413 to forestall implementation of the regulations and render them "without any effect whatsoever, as long as OPM's funding derives from" [the continuing resolution], whether or not OPM expected to spend any of it on putting the regulations into effect. *National Treasury Employees Union v. Devine*, 577 F.Supp. 738, 750 (D.D.C.1983).

In April, 1984, the court of appeals affirmed, adopting the holding of the district court. It then added a dictum, however, that:

In so holding, we emphasize the finite nature of the congressional prohibition. There is no suggestion in the language of the Hoyer Amendment, or H.R.J.Res. 413, that Congress intended to bar implementation of the regulations beyond the period during which OPM receives its funds through H.R.J.Res. 413. Moreover, as we have said, the legislative history indicates that Congress sought additional time to evaluate legislative solutions—it does not suggest that Congress permanently repealed OPM's authority to implement the disputed regulations. Therefore, we hold that when OPM's funding no longer derives from H.R.J.Res. 413, OPM will be free to take any steps deemed necessary to implement, administer and enforce the regulations, unless Congress acts to impose new restrictions.

*National Treasury Employees Union v. Devine*, 733 F.2d 114, 120 (D.C.Cir.1984).

Congress did, indeed, thereafter impose new restrictions, in the form of the Continuing Appropriations Act of 1985, Pub.L. 98–473, 98 Stat. 1963, which extended the ban until July 1, 1985,[3] and there the matter rested until in late June, 1985, when OPM intimated that it might withdraw the regulations.[4] The following day, however, the Office of Management and Budget ("OMB"), to whom the proposed withdrawal had been submitted for review pursuant to Executive Order, announced that the regulations would take effect on July 1, 1985.[5] On June 27, 1985, plaintiff AFGE filed the first of these actions.[6]

2. Later that month the other two plaintiffs here, American Federation of Government Employees ("AFGE") and National Federation of Federal Employees ("NFFE"), were permitted to intervene.

3. Section 315(j) incorporates the provisions of the Treasury, Postal Service and General Government Appropriations Act, 1985 (H.R. 5798), as provided for in its conference report, which states that "[n]one of the funds appropriated under this Act shall be obligated or expended to implement, promulgate, administer, enforce, or reissue or revise the proposed regulations and the proposed Federal Personnel Manual issuances published ... on July 14, 1983, ...

and as further superseded by proposed regulations and issuances published ... on October 25, 1983.... Provided, that this section shall expire on July 1, 1985." H.R.Rep. No. 98–993, 98th Cong., 2d Sess. at 3.

4. *See* "OPM May Cancel Plan to Revamp U.S. Job Rules," Washington Post, June 26, 1985, at 1, col. 1.

5. *See* "OMB Clears Way for New Job Rules," Washington Post, June 27, 1985, at 1, col. 2.

6. Plaintiff NTEU filed its action on June 28, 1985, and the two cases were consolidated for purposes of hearing the motions for a tempo-

**1258**

## II.

■ To obtain the preliminary injunctive relief they seek, plaintiffs must establish: (1) that they are likely to prevail on the merits of their claims; (2) that without such relief, they may expect to suffer irreparable injury; (3) that issuance of an injunction would not substantially harm other parties interested in the litigation; and (4) that it would be in the public interest to grant the relief requested. *Virginia Petroleum Jobbers Ass'n*, 259 F.2d at 925; *WMATA v. Holiday Tours*, 559 F.2d at 843.

Defendants contend that there is no likelihood that plaintiffs will ultimately succeed on the merits of their claims because (1) they lack standing to litigate their claims, and the claims themselves are not ripe for adjudication; (2) the disputed regulations were properly formulated and implemented in accordance with the "notice and comment" requirements of the APA, 5 U.S.C. § 553; and (3) the regulations are not "arbitrary, capricious, or otherwise not in accordance with law," and, thus, invalid under the APA, 5 U.S.C. § 706(2)(A).

*Standing and Ripeness*

■ As a general rule, plaintiffs have standing to sue when they can satisfy the basic Article III requirement that they show they have suffered or are likely to suffer some actual or threatened injury as a result of a defendant's allegedly illegal conduct; that the injury is fairly traceable to the challenged conduct; and that it will be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citing *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96

S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). In addition, plaintiffs must meet the "prudential" requirement that their particular concerns fall within " 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). "The zone of interests adequate to sustain judicial review," however, is deemed to be "particularly broad in suits to compel federal agency compliance with law," in keeping with the expansive scope of the provision of the APA which affords review to any person " 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,' " namely, 5 U.S.C. § 702. *FAIC Securities, Inc. v. United States*, 768 F.2d 352, 357 (D.C.Cir.1985).

■ When plaintiffs last attempted to halt the implementation of the disputed regulations by litigation in 1983, OPM also questioned the unions' standing to do so, asserting, as it does here, that the unions and their members had not suffered injury in fact. The district court, after thoughtful review, concluded otherwise, however, and refused to dismiss the suit on standing grounds, *NTEU v. Devine*, 577 F.Supp. at 743–45, and the court of appeals implicitly concurred. Whether or not this Court is bound by those earlier decisions, the considerations which convinced those courts of plaintiffs' standing to sue still obtain.

The three unions are, pursuant to statute, the exclusive bargaining representatives for multitudes of their members employed throughout the federal government.[7] Their obligations to their members are also established by statute, *see, e.g.*, 5 U.S.C. §§ 7111, 7114, and include "negotiating collective bargaining agreements, ar-

---

rary restraining order which were denied from the bench the same day. NFFE also filed suit on June 28, 1985, and all three cases were consolidated by the Court's Order of July 3, 1985, for purposes of deciding plaintiffs' motions for a preliminary injunction.

7. Title VII of the Civil Service Reform Act of 1978, 5 U.S.C. § 7101 *et seq.*, and Chapter 10 of the Foreign Service Act of 1980, 22 U.S.C. § 4101 *et seq.* AFGE represents approximately 700,000 federal employees, NFFE another 150,-000, and NTEU 110,000.

bitrating grievances, filing unfair labor practice charges, lobbying Congress on matters affecting federal employees, and litigating individual and collective rights of employees" in administrative and judicial forums.[8] The several complaints in these cases allege myriad palpable consequences emanating from the new regulations which have fundamentally altered the relationship between federal employees and their several agency employers. All three unions have submitted affidavits or declarations to the effect that real and substantial "injury," as they see it, is even now being done to the unions and their members by the regulations.

The regulations are currently (as they have been since July 3, 1985) in effect, and they purport, and will continue, to affect almost every species of personnel action for the entire federal civilian workforce in the months and years to come. That individual employees now hold their jobs upon new—and arguably less attractive—terms is a certainty, and plaintiffs need not be able to identify particular employees who will be harmed, nor to prophesy the exact nature and extent of the damage to be inflicted, to maintain such actions. The Court finds that these plaintiffs have standing in their own right and as the representatives of their members. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 341–43, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977).[9]

▇ Similarly, the Court finds that these issues are ripe for adjudication. OPM argues that the situation at the moment resembles that of *AFGE v. O'Connor,* 747 F.2d 748 (D.C.Cir.1984), in that plaintiffs are actually in quest of an advisory opinion with respect to hypothetical evils which have yet to befall them, a dispute "not wedded to the facts of a particular case." *Id.* at 749. *AFGE v. O'Connor* concerned an opinion of the Special Counsel of the

Merit Systems Protection Board ("MSPB") expressing his view as to the legality under the Hatch Act, 5 U.S.C. § 7324(a)(2) (1982), of voter registration drives conducted by members of public sector unions having committed themselves previously to particular candidates. The Special Counsel having no adjudicatory authority in Hatch Act enforcement cases, and the MSPB, in whom such authority resided, having no obligation to follow the Special Counsel's advice, the court of appeals concluded that the Special Counsel's opinion "create[d] no law and [bound] neither the public nor any agency or officer of government," 747 F.2d at 752–53, holding that the controversy was not ripe for review.

In contrast, the regulations at issue here are presently in effect, and they are binding upon hundreds of thousands of federal employees. They are, for the moment, the "final administrative word" with respect to the aspects of federal employment they cover, *id.* at 753, and the issues before the Court are therefore sufficiently concrete for judicial resolution within the meaning of *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). There is nothing "anticipatory" about plaintiffs' challenge to expected government action. *Compare Andrade v. Lauer,* 729 F.2d 1475, 1483 (D.C. Cir.1984). OPM has acted, and its action is having repercussions for plaintiffs and their members daily.

*Notice and Comment Under the APA*

▇ Plaintiffs contend that OPM's precipitous implementation of the new regulations once the congressional inhibition lapsed violated the notice-and-comment provisions of the APA, because the language used by both the district and circuit courts in the earlier litigation requires OPM to begin the rulemaking process again. Republication is also necessary, they say, be-

---

**8.** AFGE Complaint at ¶ 4; NFFE's First Amended Complaint at ¶ 3; NTEU's First Amended Complaint at ¶ 3.

**9.** The Court assumes (and thus passes any issue with respect to it for the present) that plaintiffs

are faithfully representing the views of their members who would truly prefer to work under rules favoring longevity of service over quality of performance in the conferral of certain benefits of employment.

cause the passage of time and supervening events have rendered the regulations as written obsolete and, thus, "facially invalid."

In the *NTEU v. Devine* cases both courts held that the effect Congress intended for H.J.Res. 413 was a temporal bar to implementation of the regulations, i.e., until such time as OPM's funding derived from elsewhere. Both courts, however, (apparently borrowing the language of plaintiffs' prayer for relief) spoke of the regulations as being "null and void," 577 F.Supp. at 751; 733 F.2d at 121, and plaintiffs insist that the words "null and void" mean just that, viz., that the regulations were vitiated for all purposes.

The tenor of the opinions, however, is not nearly so dogmatic as plaintiffs would have them be read. Indeed, it is clear from the totality of the court of appeals' opinion that it saw H.J.Res. 413 as nothing more than a pause for further legislative reflection, not as an act of nullification. The court expressly observed that, upon expiration or repeal of H.J.Res. 413, OPM would be free to put the regulations into effect by whatever means it "deemed necessary," unless Congress were to direct otherwise, 733 F.2d at 120, a proposition clearly inconsistent with the notion that nothing remained of them to be given effect. As the court of appeals itself reasoned in the same case, albeit in another context, when the "plain meaning" of words leads to "absurd or futile results," or merely an unreasonable one "plainly at variance with the policy ... as a whole," courts should follow purpose rather than literal words, *id.*, quoting *United States v. American Trucking Ass'n*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940), and that reasoning is altogether apposite in considering its own use of the words "null and void" in the light of the balance of its opinion.

*Action on Smoking and Health v. Civil Aeronautics Bd.*, 713 F.2d 795 (D.C.Cir.

1983), cited by plaintiffs as an analogous case, is, in fact, not so. That case involved regulations which had earlier been "vacated" because the agency had failed to provide an adequate statement of their basis and purpose, as the APA requires. 5 U.S.C. § 553(c). *See Action on Smoking and Health v. Civil Aeronautics Bd.*, 699 F.2d 1209, 1215–17 (D.C.Cir.1983). Despite the decision, however, the agency then promulgated substantially identical regulations without new notice and comment, prompting the court to explain in its later opinion that by the word "vacate" it had meant to cancel or rescind the regulations in their entirety. *Action on Smoking and Health*, 713 F.2d at 798–99.[10] In the instant case, OPM's regulations have never been found to be technically defective in either origin or content; unlike the Civil Aeronautics Board's regulations in *Action on Smoking and Health*, they have not been "vacated," and the process of promulgation need not begin anew.

Plaintiffs next submit that a new notice-and-comment period should be required because more than two years have elapsed since the regulations were published in 1983, and they are now dated. There appears to be no bright-line rule as to the "useful life" of a notice-and-comment record (although the court of appeals has warned that it is "not infinite." *See Action on Smoking and Health*, 713 F.2d at 800.) But the APA requires only that "notice of proposed rulemaking ... be published in the Federal Register" at least 30 days prior to the rules' effective date, and interested persons given "an opportunity to participate in the rule making through submissions of written data, views, or arguments," which the agency must explicitly consider in a reasonably contemporaneous statement of basis and purpose. 5 U.S.C. § 553. Nor is a new notice-and-comment period required merely because final regu-

---

**10.** The court added that it purposely had not remanded initially to the agency for an amended statement of basis and purpose which, in the circumstances, would have produced only a *post hoc* rationalization. *Id.* at 799–800. By "vacat-

ing" the rules it had ended the rulemaking proceeding, and, "[i]f one rulemaking proceeding has culminated and another has begun," said the court, "then new notice and comment procedures are required." *Id.* at 800.

lations differ from those originally proposed. As the court of appeals has stated:

> An agency adopting final rules that differ from its proposed rules is required to renotice when the changes are so major that the original notice did not adequately frame the subjects for discussion.... The agency need not renotice changes that follow logically from or that reasonably develop the rules it proposed originally.

*Connecticut Light and Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 533 (D.C.Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). *See also Air Transport Ass'n of America v. Civil Aeronautics Bd.*, 732 F.2d 219, 224–25 (D.C.Cir.1984); *Weyerhauser Co. v. Costle*, 590 F.2d 1011, 1031 (D.C.Cir.1978).

The proposed regulations published in the Federal Register in July, 1983, were substantially (if not exactly) the same as the final version published in the Federal Register in late October, 1983, and although, as matters developed, they would not take effect until nearly two years later, their subject matter is as essentially ageless as it is perpetually controversial. As subjects for discussion, the regulations have been adequately framed, as well as discussed, for a good two years, and plaintiffs, the general public, and Congress were all given notice by the court of appeals that OPM would be in position, if it wished, to implement the rules on July 1, 1985, when H.J.Res. 413's prohibition lapsed, unless something were to happen in the interim. Further notice now, not to mention comment, would be superfluous.

For similar reasons it is apparent that the fact that the implementation schedules established in the 1983 regulations are outdated, or that Congress has superseded a portion of the regulations by subsequent legislation, does not make it imperative

that entire process be gone through again. Plaintiffs have submitted no authority for the proposition that the regulations, *mutatis mutandis*, are rendered "facially invalid" in their entirety by such circumstances, and indeed, common sense would dictate otherwise.[11]

*The Substance of the Regulations*

■ Plaintiffs also challenge substantively various provisions of the new regulations themselves as "arbitrary, capricious, or otherwise not in accordance with law," as the APA proscribes. 5 U.S.C. § 706(2)(A). The standard of review of agency action alleged to be defective under the APA, however, is highly deferential, and the Court may not substitute its judgment for that of the agency as long as the agency's choices are rational in light of the facts presented to it. *Environmental Defense Fund v. Costle*, 657 F.2d 275, 283 (D.C.Cir.1981); *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), *reh'g denied*, 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1983). The provisions plaintiffs find offensive must, therefore, be examined with this principle in mind.

■ 1. Under the old regulations an employee's retention standing in case of a RIF could be enhanced by service credit awarded on the basis of his or her performance rating as of the date of the RIF notice. The maximum possible credit, for an "outstanding" rating, was four years. 5 C.F.R. § 351.504 (1984). Under § 351.-504 of the new regulations, 48 Fed.Reg. 49,467 (1983), entitlement to service credit is based upon annual performance ratings for the three years *prior* to issuance of a

---

**11.** Legislation enacted in November, 1984, superseded Part 540 of the Regulations and substituted the Performance Management and Recognition System for the Merit Pay System for supervisors and managers in grades GS–13 through GS–15. 5 U.S.C. § 4302a. OPM thereafter promulgated separate regulations designed

to implement it. *See* 40 Fed.Reg. 11,788 (March 25, 1985).

Following oral argument on these motions OPM published a revised version of the regulations at issue here which, *inter alia,* established a current implementation schedule. *See* 50 Fed. Reg. 35,488 (August 30, 1985).

RIF notice, and the maximum credit available is ten additional years of service for each rating of "outstanding." [12] Thus, an employee with three successive "outstanding" ratings could earn an additional thirty years of service credit.

Plaintiffs contend that this provision, ostensibly rewarding meritorious performance, is in actuality a convenient camouflage for "cronyism" or a device to facilitate employment decisions which depend upon employees' allegiance to their supervisors' political agendas. In addition, plaintiffs assert that the provision violates 5 U.S.C. §§ 3502 and 2301, which relate to the order of retention of employees in a RIF, and that OPM has not adequately explained its reasons for adopting the new rule.

The evils of cronyism and political favoritism, however, are not only entirely spectral at the moment, but when they materialize they can flourish no matter what the applicable regulations provide. There is nothing on the face of this particular regulation to indicate any purpose for it other than the obvious, i.e., to place greater emphasis on sustained merit and less on seniority in determining who stays and who goes in a reduction in force, and the use of additional service credits based upon several years' performance ratings appears an entirely rational way to achieve the goal. Although it might be equally reasonable to assign a credit of, say, six years or four years, as opposed to ten, for a rating of "outstanding," OPM's choice of the latter certainly cannot be said to be arbitrary and capricious.

Nor does the Court perceive the regulation to be antithetical to 5 U.S.C. §§ 2301 and 3502. Section 2301(b)(6), a part of the Civil Service Reform Act, provides that, as a matter of general principle, employees "should be retained on the basis of the adequacy of their performance." [13] And Section 3502 grants OPM the authority to promulgate regulations for the release of employees in a RIF, with "due effect" to be given to tenure of employment, military preference, length of service, and efficiency or performance ratings. Plaintiffs read into this linear list a "ranking" of the factors, i.e., a statutory requirement that seniority be accorded greater importance than merit in deciding who stays, but there is nothing elsewhere in the statute or its history to so indicate, nor, for that matter, to suggest an intention on the part of Congress to preclude OPM from determining for itself the effect to be "due" to each factor.

■ 2. Section 531.404 of the new regulations provides that an employee is eligible for a within-grade increase if he meets certain requirements, including that his performance of the work assigned him be "at an acceptable level of competence," which is defined as a rating of at least "fully successful" on each critical job element under his agency's performance management plan. 48 Fed.Reg. 49,486 (1983). Plaintiffs contend that this contravenes 5 U.S.C. § 5335, which provides for within-grade increases only if, *inter alia,* the employee's work is of an acceptable level of competence "as determined by the head of the agency." (The old regulation added, however, that the employee's level of competence could be evaluated by any agency official to whom such authority had been delegated. *See* 5 C.F.R. § 531.404 (1984)).

There is no inconsistency between the statute and the regulation. The agency, by statute, is to determine the critical and noncritical elements for each job and set the performance standards required for a rating of "fully successful." *See* 5 U.S.C. § 4302a(b). The agency head is responsible for his agency, and, thus, for determining the acceptable level of competence for each position within it. The only change in practice effected by the new

---

**12.** Each rating of "exceeds fully successful" qualifies an employee for seven additional years; each "fully successful" rating earns an additional five years.

**13.** Indeed, passage of the Civil Service Reform Act generally reflected Congress' affirmative desire to make merit more central to a variety of federal personnel decisions.

regime is to cause such determinations to be made within the framework of the performance appraisal system format.

■ 3. Another provision of the new regulations which plaintiffs believe to contravene statutory law is § 430.204(p), which states that employees must be given the right to ask for reconsideration of a performance rating by their supervisors or managers, and that additional review procedures "may be established at the discretion of the agency head." 48 Fed.Reg. 49,480 (1983). Plaintiffs assert that this provision violates the Civil Service Reform Act, 5 U.S.C. § 7121, which provides that collective bargaining agreements "shall provide procedures for the settlement of grievances," 5 U.S.C. § 7121(a)(1), other than those specifically excluded by the parties or by statute.[14]

The relevant comments explain that the regulation as originally proposed rejected both appeals and grievances of performance ratings, but negative responses to the proposal prompted inclusion of the provision mandating reconsideration. They further state that, while agencies are free to negotiate with respect to review procedures and may also permit grievances, they are entitled to determine that performance ratings are not grievable. 48 Fed.Reg. 49,-474–75 (1983).

Thus, nothing in the new regulations prevents the unions from bargaining with respect to grievances of performance ratings, and, of course, an agency may not refuse to provide grievance procedures where required to do so by statute. The discretion accorded the agency head would appear, therefore, to amount only to freedom to determine what bargaining position to take when negotiating with a union, within the constraints of applicable law.

■ 4. Plaintiffs next take issue with § 351.901, which provides for appeals from reductions in force to the Merit Systems Protection Board ("MSPB"), but permits review of the agency's action solely on the

written record if the presiding official determines that there are no material issues of fact in dispute that would require a hearing. Plaintiffs contend that this section violates 5 U.S.C. § 7701, which provides that in appeals to the MSPB, the appellant "shall" have the right to a hearing.

The long-standing law of this circuit, however, is that an agency is not required to provide a hearing, even when mandated by statute, if it would serve no purpose, as, for example, when there are no material issues of fact in dispute. *See Independent Bankers Ass'n of Georgia v. Board of Governors of the Federal Reserve System,* 516 F.2d 1206, 1220 (D.C.Cir.1975); *General Motors Corp. v. Federal Energy Regulatory Comm'n,* 656 F.2d 791, 795 (D.C. Cir.1981). Although an agency may bear "a heavy burden of justification," *Independent Bankers Ass'n,* 516 F.2d at 1220, and a statutorily-required hearing should be denied "only in exceptional circumstances," *id.* at 1220, n. 57, a determination as to the regulation's illegality must await an actual denial of a hearing in a crystallized situation. Absent an application of the regulation in the context of a specific case, consideration of its validity would be premature.

■ 5. Section 351.701(d) of the new regulations concerns "bumping" of employees in a RIF situation, and provides, specifically, that clerical employees are precluded from bumping non-clerical employees and *vice versa.* (The comment explains that the provision was designed "to limit excessive disruption caused by bumping and retreating across the entire grade structure." 48 Fed.Reg. 49,462 (1983)). Plaintiffs challenge this provision on the grounds that employees may be differentiated only in accordance with 5 U.S.C. § 3502, which does not recognize such a dichotomy. Section 3502, however, says nothing at all about bumping; it authorizes OPM to promulgate appropriate regulations, giving due effect to such factors as seniority and

---

14. "Grievance" is defined in 5 U.S.C. § 7103(a)(9)(A) as any complaint "by any employee concerning any matter relating to the employment of the employee."

performance, and certainly does not purport even remotely to preclude a distinction between clerical and non-clerical employees, for bumping or any other purpose.

■■■ 6. Plaintiffs contend that §§ 551.-204(a) and 551.203(c) of the new regulations violate the Fair Labor Standards Act ("FLSA"). Specifically, the FLSA provides that overtime will be paid to employees who work more than 40 hours, except for those who are "employed in a *bona fide* executive, administrative or professional capacity," as those terms are elsewhere defined, by regulations to be promulgated in accordance with the APA. 29 U.S.C. §§ 207, 213(a)(1). Although OPM has defined executive employees with reference to the "supervisory grade evaluation guide" which is part of the Federal Personnel Manual, ("FPM"), and which is not ordinarily published in accordance with the provisions of the APA, 48 Fed.Reg. 49,496 (1983), OPM responds that any future changes in this portion of the FPM will be made in accordance with the APA, and unless and until OPM does otherwise, this particular issue is not ripe for judicial intervention.

Plaintiffs also assert that § 551.203(c), which establishes a regulatory presumption that employees at grades GS–11 and above are exempt from the overtime provisions of the FLSA, violates longstanding law to the effect that the burden of proof of an FLSA exemption is on the employer. *See, e.g., Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 394, 80 S.Ct. 453, 457, 4 L.Ed.2d 393 (1960). OPM contends, however, that there is ample basis to presume that employees at these high grade levels would be exempt,[15] and that the presumption is, moreover, easily rebuttable. The administrative presumption does not, of course, affect the burden of proof applicable in a court of law.

In sum, the Court does not find on the record now before it any of the provisions challenged by plaintiffs to be arbitrary and capricious or otherwise unlawful, and plaintiffs have not, therefore, met their burden of establishing a likelihood that they will succeed in persuading it to the contrary at trial.[16]

### III.

■■■ In the absence of a showing of likely success on the merits, it is unnecessary to address the other requirements for issuance of preliminary injunctive relief, but the Court notes for purposes of review that plaintiffs have not demonstrated the existence of these other elements to its satisfaction either.

First, with respect to irreparable injury, the Court finds that while both unions and their members find themselves in altered (and, to them, distasteful) circumstances as a result of the new regulations, they cannot be said to have sustained an "irreparable injury" as that term has been interpreted by the Supreme Court. In *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), the Supreme Court had before it the case of a federal employee who sought injunctive relief to prevent her imminent discharge pending completion of an administrative appeal, and, although the instant case is obviously distinguishable on its facts, it is significant that the Court there found that no irreparable injury would ensue from the employee's dismissal, either in terms of lost earnings or damaged

---

**15.** In its accompanying comment, OPM estimates that by its calculations the population of high-grade employees who might become exempt under the presumption does not exceed 20,000—one percent of the total number of covered employees. 48 Fed.Reg. 49,495.

**16.** NTEU raises an additional issue, to wit, that the decision to implement the regulations on July 1, 1985, was due to an unlawful usurpation by OMB of the rulemaking authority delegated by Congress to OPM. However, the record on this issue is altogether inadequate to permit the Court to reach any conclusion. Plaintiff relies entirely upon newspaper articles for its claim of illegality on the part of OMB; OPM responds, also without evidentiary support, that OMB's role was merely consultative in nature. Unless and until this issue is properly developed, the Court declines to address NTEU's allegations and does not factor them into its decision with respect to plaintiffs' likelihood of success on the merits.

reputation, and therefore, that the lower court's issuance of an injunction was improper.[17] Similarly, to the extent that individual employees represented by plaintiffs here to whom the new regulations apply are unlawfully dismissed in a RIF, or denied a within-grade increase, or refused overtime pay under the FLSA, each retains his or her individual remedies, and the fact that vast numbers of employees are potentially affected instead of just one does not raise the irreparability quotient of the situation. Injuries of this sort ordinarily cannot be aggregated numerically to reach a magic threshold at which they collectively become irreparable.

Nor is the Court persuaded by plaintiffs' argument that irreparable injury will be incurred by the unions *qua* bargaining agents because the negotiations process will be hampered by the uncertainty attendant upon the status of the new regulations. As in the case of any newly-promulgated rules, there is likely to be confusion at the outset, but, as OPM points out, both sides are equally affected, and the issuance of a preliminary injunction would not only not alleviate, but, indeed, would probably prolong and intensify the uncertainty. Moreover, as astute negotiators frequently are, plaintiffs may be able to turn uncertainty to their advantage in future negotiations,[18] and in that sense the new regulations may represent more opportunity than injury.

Finally, the Court finds that it would neither be equitable nor in the public interest to force a return to the old regulations until this case is finally determined. Not only would it cause yet another disruption in the orderly administration of the government, but the new regulations reflect a conscious policy decision by OPM to substitute meritocratic principles for a system it has regarded for some time as an enervating influence on the federal workforce.

For more than two years OPM has been endeavoring to implement the new regulations over the misgivings of Congress (which never, however, progressed to outright repudiation), and the opposition of some federal employees and their unions who see in them a threat to job security. OPM submits that its new rules will afford a greater assurance of job security in the long run to those civil servants most deserving of it, and of a civil service for the nation of the quality OPM intends for it to have. Pending a decision on the merits, at least, and in the absence of a congressional judgment that the changes wrought by them are unwise, the new regulations should be given a long-awaited chance to work.

Therefore, for the foregoing reasons, it is, this 30th day of September, 1985,

ORDERED, that plaintiffs' motions for a preliminary injunction are denied.

---

**17.** The Court also adverted to the "well-established rule" that the government "has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" 415 U.S. at 83, 94 S.Ct. at 949 (quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961)).

**18.** Collective bargaining agreements already in existence are not affected unless they were specifically tied by agreement to future regulations. *See* 5 U.S.C. § 7116.