**NATIONAL AIR TRAFFIC CONTROL-
LERS ASSOCIATION, MEBA, AFL–
CIO, et al., Plaintiffs,**

v.

**Federico PENA, Secretary of the
Department of Transportation,
et al., Defendants.**

**No. 1:94CV0574.**

United States District Court,
N.D. Ohio,
Eastern Division.

Nov. 8, 1996.

Eben O. McNair, Schwarzwald & Rock, Cleveland, OH, James E. Grooms, Elizabeth J. Head, Beins, Axelrod, Osborne, Mooney & Green, and William W. Osborne, Jr., Law Offices of William W. Osborne, Jr., Washington, DC, for Plaintiffs.

Kent W. Penhallurick, Office of the U.S. Attorney, Cleveland, OH, Sandra M. Schraibman, and Elizabeth J. Shapiro, Department of Justice, Civil Division, Washington, DC, for Defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

The National Air Traffic Controllers Association, MEBA, AFL–CIO ("NATCA") and two individual air traffic controllers, David Clinkscale and Margaret Graham, filed this suit against Federico Pena, Secretary of the Department of Transportation ("DOT"), and David Hinson, Administrator of the Federal Aviation Administration ("FAA"), challenging the FAA's decision to privatize operations at Level 1 air traffic control towers.

On June 19, 1996, defendants filed a supplemental motion to dismiss the case for lack of jurisdiction, asserting that plaintiffs lack standing under Article III, that they failed to exhaust administrative remedies, and that the case is not ripe for review. For the reasons stated below, the Court denies defendants' motion.

### I. Facts

In September of 1993, the FAA, a division of the Department of Transportation, determined that it would proceed with its decision to contract out to the private sector the air traffic control responsibilities at all one hundred and fifteen (115) of its Level 1 facilities.[1] Second Am.Compl., ¶ 19. Pursuant to this privatization plan, the first 25 Level 1 towers were converted to private ownership in 1994, as were an additional 25 in 1995. Def.'s

Supp. Motion to Dismiss, 9. Another 25 were slated to be privatized during July and August of 1996. Id. The FAA continues to proceed with its plan.

In the course of the privatization of Level 1 towers, 1,500 air traffic controllers employed by the FAA at these towers will lose their current government jobs and will be forced to either (1) relocate to another FAA facility in order to remain employed by the FAA as air traffic control specialists, or (2) retire or resign from federal service, in which case they may seek employment with the private contractor who takes over their tower.[2]

Federal procurement policy, as it relates to the FAA and DOT, is governed by the Office of Federal Procurement Policy Act ("OFPPA"), 41 U.S.C. § 401 et seq., and the Budget and Accounting Act of 1921 ("Act of 1921"), 31 U.S.C. § 101 et seq. Pursuant to these statutes, the Office of Management and Budget ("OMB") promulgated OMB Circular A–76, which governs agency decisions on whether commercial activities should be performed in-house by federal employees or under contract with commercial sources. Circular A–76 sets out an elaborate, mandatory scheme of procedures which agencies must follow before contracting out such activities.

Specifically, Circular A–76 first requires an agency to evaluate its activities in order to determine whether they are governmental functions or commercial activities. Governmental functions must be performed by government employees, while commercial activities may be contracted out to the private sector, unless the agency determines that they must be performed by government employees for national defense purposes. Once an activity is determined to be a commercial activity that is eligible to be contracted out, the agency must complete a cost comparison

---

1. Air traffic control towers are classified on a scale from Level 1 to Level 5, depending on the volume and complexity of the air traffic they handle. Level 1 towers use only visual flight rules ("VFR") and are not equipped with any of the radar equipment used in conjunction with instrumental flight rules ("IFR"). Level 1 towers have an hourly traffic density factor of less than 35 operations, are generally located on the out-

skirts of urban areas or in rural areas, and service light aircraft. Level 5 towers, on the other hand, include those at Kennedy and O'Hare airports.

2. Since 1994, when the original complaint was filed, many employees have already gone through this process.

study to ascertain whether the activity can be performed more economically by private contractors. In certain cases, the assistant secretary of the agency may authorize a waiver of the study. If the activity can be performed more economically by the private sector, then the commercial activity must be privatized.

In 1994, NATCA, along with Clinkscale and Graham, two air traffic control specialists employed at Burke Lakefront, a Level I facility in Cleveland, Ohio, filed suit challenging the FAA's decision to contract out Level 1 air traffic control towers. Plaintiffs contend that the FAA's privatization of Level 1 towers violates the statutory scheme established by the Act of 1921, and the OFPPA, and the mandatory procedural requirements of Circular A–76 and its Supplement. In particular, plaintiffs allege that the FAA's plan violates the Circular and its Supplement because (1) the FAA is unlawfully contracting out an inherently governmental function; (2) the FAA's decision to contract out air traffic control responsibilities will impair the national defense; (3) the FAA improperly waived the requirement that a cost comparison study be performed prior to a decision to contract out; and (4) the FAA's decision to contract out Level 1 facilities does not meet the cost/benefit requirements of the Circular and its Supplement. Plaintiffs seek a declaration that the FAA's decision is unlawful, and an injunction prohibiting further implementation of the privatization plan.

On November 28, 1994, this Court granted defendants' original motion to dismiss the suit, on the grounds that plaintiffs failed to meet the prudential requirements for standing under the Administrative Procedure Act. On appeal, the Court of Appeals for the Sixth Circuit reversed that decision, and remanded the case to this Court in order to complete the standing analysis by determining whether plaintiffs have standing under Article III of the Constitution.

Subsequently, on June 19, 1996, defendants filed a supplemental motion to dismiss for lack of jurisdiction, arguing that plaintiffs lack Article III standing, that they failed to exhaust administrative remedies, and that the case is not ripe for review. Because the parties have not fully briefed the issue of exhaustion, this Court now considers only the issues of Article III standing and ripeness.[3] For the reasons stated below, the Court denies defendants' motion to dismiss, as plaintiffs have met the requirements of standing under Article III of the Constitution, and the case is ripe for review.

## II. Standing

■ For purposes of ruling on a motion to dismiss for lack of standing, the court must view the complaint in the light most favorable to the plaintiff, accepting as true all material allegations in the complaint. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). The court may also consider any affidavits submitted by plaintiff containing further particularized allegations of fact deemed supportive of standing. *Id.* at 501–02, 95 S.Ct. at 2206–07. A complaint must be dismissed if "the plaintiff's standing does not adequately appear from all materials of record." *Id.* at 502, 95 S.Ct. at 2207.

■ Because the federal courts are courts of limited jurisdiction, the threshold question in every case is whether there exists a "case or controversy" over which the federal court may exercise its power. *Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta*, 713 F.2d 1221, 1225 (6th Cir.1983); U.S. Const. art. III, § 2. Article III's "case

---

**3.** In a status conference held on May 20, 1996, the parties were instructed to brief only the issue of Article III standing. Subsequently, in their supplemental motion to dismiss, defendants also argued that the case was not ripe for review, and that the Court did not have jurisdiction because plaintiffs had not exhausted their administrative remedies. Plaintiffs, relying on the discussion at the status conference, did not fully address these arguments. While it is true that defendants may raise the issue of lack of subject matter jurisdic-

tion at any time, the Court is unable to resolve the question of exhaustion without further briefing by the parties. For this reason, the Court reserves ruling on whether plaintiffs have exhausted their administrative remedies, and requests briefing on this issue. The Court does, however, address the ripeness argument, as the issues involved are similar to those involved in the standing analysis. Accordingly, this decision goes only to the question of Article III standing and ripeness.

or controversy" requirement serves to distinguish "those disputes which are appropriately resolved through the judicial process," *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722–23, 109 L.Ed.2d 135 (1990), from those which are merely "generalized grievances" not arising from any specific injury to the complaining party. *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205.

▇▇▇ In order to establish standing to sue in federal court, a plaintiff must satisfy certain minimum constitutional requirements. In particular, an individual plaintiff must show:

(1) that he or she has suffered an "injury in fact;"

(2) that there is a causal connection between the injury and the conduct complained of; and

(3) that it is likely that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). When a plaintiff challenges government action or inaction, as in this case, the facts necessary to establish standing depend considerably on whether the plaintiff is directly injured by the action or inaction being challenged, or whether the plaintiff's injury arises from the government's behavior in connection with a third party. *Id.* at 561–62, 112 S.Ct. at 2136–37. When the plaintiff is the very object of the government behavior at issue, "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it." *Id.*

### A. Individual Employees' Standing

▇▇▇ In order to satisfy the mandate of Article III, a plaintiff must clearly show the existence of "injury in fact." [4] The injury alleged by plaintiff "must be concrete in both a qualitative and temporal sense." *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990).

Rather than being merely abstract, the injury must be "distinct and palpable," *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), or stated differently, "concrete and particularized." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

▇▇▇ Moreover, the alleged injury must be "actual or imminent, not 'conjectural' or 'hypothetical.'" *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. at 2136 (quoting *Whitmore,* 495 U.S. at 155, 110 S.Ct. at 1722–23). Although imminence "is concededly a somewhat elastic concept, [its purpose] is to ensure that the injury is not too speculative for Article III purposes—that the injury is certainly impending." *Defenders of Wildlife,* 504 U.S. at 565 n. 2, 112 S.Ct. at 2139 n. 2. (citations omitted). Therefore, while an allegation of possible future injury does not satisfy the requirements of Article III, an allegation of threatened injury that is "certainly impending" does constitute injury in fact, and does meet the constitutional threshold. *Whitmore,* 495 U.S. at 158, 110 S.Ct. at 1724; *Brunet v. City of Columbus,* 1 F.3d 390, 396 (6th Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1190, 127 L.Ed.2d 540 (1994).

Plaintiffs allege that if the FAA completes privatization of their jobs in violation of applicable regulations, they "will be injured by the loss of government employment, wages and benefits." Second Am.Compl., ¶ 33. In particular, as evidenced by an affidavit submitted by plaintiff Clinkscale in the Sept. 20, 1994 response to the original motion to dismiss, employees at Level 1 towers will be forced "to either resign or transfer to an entirely different FAA facility and location." Clinkscale Aff., ¶ 4. As a result of this forced "choice," plaintiffs allege, employees face a variety of further harms.

If an employee is forced to resign from government service, he or she will lose "the rights and enjoyments of federal service, including ... retirement pension, seniority,

---

4. The parties do not dispute the satisfaction of the second and third prongs of the standing test—causation and redressability. It is clear that the harm alleged by plaintiffs is "fairly traceable" to the government's alleged failure to comply with OMB Circular A–76, and would likely be "redressed by a favorable decision." *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. at 2136. Therefore, only the existence of injury in fact is at issue.

health benefits, life insurance, annual and sick leave and job security." Clinkscale Aff. ¶ 4. Even though employees will be given a right of first refusal with the private contractor operating their tower, their ability to secure a position is contingent on the number of employees the private contractor wishes to maintain. Clinkscale Aff., ¶ 10.

On the other hand, in order to remain in government service, an employee must attempt to transfer to another FAA facility—either Level 2, 3, 4 or 5. Although the FAA will make every effort to transfer employees to the facility of their choice, there is no guarantee that such accommodation will be possible. In fact, because the FAA will consider the overall needs of the agency in making transfers, there is no guarantee that an employee will be transferred at all. Clinkscale Aff., ¶ 7. If an employee does transfer to a higher level facility but fails to successfully complete the required training and certification, the employee will not be able to return to the Level 1 position, and there will be no Permanent Change of Station funds to relocate the employee. Clinkscale Aff. ¶ 9. Thus, plaintiffs allege, transfer places employees' financial security at risk. Id.

Defendants do not argue that plaintiffs have failed to allege harm to a cognizable interest. Rather, defendants argue that plaintiffs have not shown that any injury alleged has in fact occurred or is certain to occur. See Def.'s Reply in Support of Def.'s Supp. Motion to Dismiss, 4. Instead of alleging specific injury to specific plaintiffs, defendants argue, plaintiffs' claim of harm is premised on the occurrence of a number of contingencies which may or may not ever materialize. See Def.'s Supp. Motion to Dismiss, 13. According to defendants, because it is unclear what will happen to employees after they lose their Level 1 FAA jobs, plaintiffs' injuries are merely speculative, not "imminent," and therefore, insufficient to establish standing.

■■■ Defendants' characterization is erroneous, however, for it focuses on the wrong injury. While it may be true that at present, employees who have not yet been fired do not know which path they will take after they lose their current jobs, plaintiffs still have alleged an injury in fact sufficient to establish standing—the loss of their current government jobs. Many employees have already lost their FAA Level 1 jobs, and as the privatization continues, the others will as well. Whether a particular employee "chooses" to attempt transfer to a different FAA facility, or "chooses" to attempt exercise of a right of first refusal with the private contractor at his or her current location, he or she has still suffered the loss of an FAA Level 1 job. Defendants' focus on the various harms that may occur after this loss is misplaced, for they only represent scenarios that may materialize *after* the initial injury has been sustained.

The air traffic controllers' loss of their Level 1 government jobs is sufficient to constitute injury within the meaning of Article III. *See, e.g., Nat'l Maritime Union of Am. v. Commander, Military Sealift Command,* 824 F.2d 1228, 1235 (D.C.Cir.1987) (finding that Union members' loss of jobs resulting from displacement by new employees pursuant to contract award constituted injury in fact); *Int'l Ass'n of Firefighters, Local F–100 v. U.S. Dep't of the Navy,* 536 F.Supp. 1254, 1261 (D.R.I.1982) (finding that loss of government jobs upon privatization of firefighting services constituted injury in fact). Moreover, the government cannot erase this injury by pointing out that there may be ways to lessen the blow later. Contrary to defendants' assertions, the fact that the FAA has offered employees who lose their jobs the opportunity to transfer to a higher level facility, or exercise a right of first refusal with the private contractor, simply does not change the fact that privatization will result in plaintiffs losing their current government jobs as alleged in the complaint.

In *International Ass'n of Firefighters, Local F–100 v. U.S. Department of the Navy,* 536 F.Supp. 1254 (D.R.I.1982), a union challenged privatization of firefighting services at the Naval Education and Training Center, alleging that its members would suffer economic injury if their jobs were contracted out to the private sector. The Government asserted that union employees would not necessarily suffer injury if their jobs were contracted out, since the Navy was required to

make efforts to find suitable alternative employment for displaced employees, including granting employees a right of first refusal for openings with the private contractor, and priority consideration and training for other government positions. *Id.* at 1262 n. 2. The court rejected the government's argument, stating that even "assum[ing] the Navy would do so . . . there is no guarantee such efforts would succeed." *Id.* at 1261–62. Therefore, the court held, regardless of the possibility of future redress through alternative placement, plaintiffs had shown injury in fact. *Id.* Similarly, in the case at hand, the fact that the FAA has offered displaced employees a right of first refusal with the private contractor or the opportunity to attempt transfer to another facility does not guarantee that plaintiffs will obtain another job.

Furthermore, the loss of current jobs is an injury even if the FAA's post-displacement efforts do succeed, since a new job, particularly one in the private sector, will entail different terms and conditions, both economic and non-economic. In *American Federation of Government Employees v. Office of Personnel Management* 618 F.Supp. 1254 (D.D.C.1985), *aff'd,* 782 F.2d 278 (D.C.Cir. 1986), unions representing federal employees brought suit against the OPM, challenging the implementation of newly promulgated regulations changing various terms and conditions of their employment, "including such matters as reductions in force ("RIFs"), promotions, performance management systems, pay administration . . . and others." *Id.* at 1256. OPM argued that plaintiffs did not have standing because they had not shown any injury in fact. The court rejected OPM's argument, finding that due to the new regulations, all federal civilian employees held their jobs on new terms. *Id.* at 1259. The fact that plaintiffs felt these new terms to be less desirable was enough to show they suffered injury in fact, the court held, and "plaintiffs need not be able to identify particular employees who will be harmed, nor to prophesy the exact nature and extent of the damage to be inflicted, to maintain such actions." *Id.* Plaintiffs here will be similarly injured, for even if they obtain another government job, it will not be a job with the same type of work, or the same combination of salary, benefits, location, work conditions, and other intangible qualities they enjoy in their current government jobs.

The loss of these jobs is "actual or imminent," as required by Article III. Regardless of subsequent events, the injury incurred in the initial job loss has actually occurred for some employees, and is certain to occur for the rest. In the case of plaintiffs Graham and Clinkscale, defendants state that the imminence requirement is not satisfied because Burke Lakefront "has not yet been contracted out and is not scheduled to be contracted out in this fiscal year." Def.'s Supp. Motion to Dismiss, 12. But regardless of whether it occurs this year, the contracting out of all Level 1 towers, as alleged by plaintiffs, is "certainly impending," and therefore, "imminent." *Defenders of Wildlife,* 504 U.S. at 564 n. 2, 112 S.Ct. at 2138 n. 2; *Sierra Club v. Marita,* 46 F.3d 606, 612 (7th Cir.1995) ("The Supreme Court explicitly stated in *Lujan v. Defenders of Wildlife* that a plaintiff clearly has standing to sue where there is a concrete injury underlying the procedural default even if the plan were not implemented immediately").

Defendants' reliance on *Adult Video Ass'n v. U.S. Department of Justice,* 71 F.3d 563, 567 (6th Cir.1995), for the assertion that the harm alleged here is "precisely the sort of hypothetical future harm prohibited by current standing requirements" is misplaced. In *Adult Video Ass'n,* a trade association comprised of members who produced, manufactured, distributed, sold, and rented sexually explicit movies sought a declaratory judgment that the film "After Midnight" was not legally obscene. *Id.* at 565. The association asserted that the fear of potential future prosecution chilled its members' distribution of the film. *Id.* at 566. The court found that the association had stated a hypothetical harm insufficient to establish standing, because it failed to allege any "statements or actions on the part of the federal government that would indicate that the government intends to prosecute Adult Video's members if they distribute [the film]." *Id.* at 567.

In contrast, the case before the Court involves not the mere possibility of future gov-

ernment action, but an actual, specific plan which is already underway and certain to continue. Accordingly, this case is more akin to cases in which courts have found that plaintiffs had standing to challenge government plans allegedly resulting from failures to comply with procedural requirements. *See, e.g., Sierra Club v. Marita,* 46 F.3d 606 (7th Cir.1995) (environmental groups had standing to challenge forest management plans allegedly developed in violation of statutory requirements); *Friends of Boundary Waters Wilderness v. Thomas,* 53 F.3d 881 (8th Cir.1995) (environmental group had standing to challenge land resource management plan providing for expansion of timber sales); *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346 (9th Cir.1994) (environmental groups had standing to challenge environmental impact statement and vegetation management plan authorizing use of herbicides).

■ The injury to FAA Level 1 employees is imminent because the FAA's privatization plan does not merely contemplate the contracting out process, but affirmatively requires it. In *Sierra Club v. Marita,* 46 F.3d 606 (7th Cir.1995), the Seventh Circuit held that a group of environmental organizations had standing to challenge forest management plans allegedly developed by the U.S. Forest Service without proper consideration of certain ecological principles as required by statute. The Forest Service questioned the imminence of the alleged injury to plaintiffs' use and enjoyment of the forests at issue, arguing that until some action was actually taken, the injury was not imminent. *Id.* at 611. The court disagreed, holding that because the plan clearly required certain projects to be carried out, the harms alleged were "imminent" rather than "speculative." *Id.* at 611–12. The court distinguished *Defenders of Wildlife,* relied upon by defendants here, in which the Supreme Court

found plaintiffs' claimed injury too speculative to constitute injury in fact:

> the *Defenders* Court did not perceive the plaintiffs' interests as necessarily materializing, a situation far from the present case where it is only a matter of time before the management plans are implemented and affect the Sierra Club's interests.

*Id.* at 613. The failure of the *Defenders of Wildlife* plaintiffs to establish imminence is similarly inapposite here, where as in *Marita,* it is only a matter of time before remaining Level 1 FAA employees will lose their jobs.

Moreover, this loss is imminent because the FAA's privatization plan specifically targets Level 1 towers for contracting out, and is already being implemented. In *Friends of Boundary Waters Wilderness v. Thomas,* 53 F.3d 881 (8th Cir.1995), the Eighth Circuit held that plaintiffs had standing to challenge a resource management plan because it explicitly and specifically provided for expansion of timber sales, and was thus distinguishable from a plan used only as "a general planning tool for decisions to be made in ten or fifteen years." *Id.* at 887. The FAA's privatization decision is similarly distinguishable from such a general planning tool.

■ Because plaintiffs have alleged a concrete injury—the loss of their current government jobs—which is certainly impending as a result of the FAA's plan to contract out Level 1 air traffic control responsibilities, they have shown an "injury in fact" sufficient to confer standing.[5] Furthermore, plaintiffs' asserted injury is caused by the FAA's alleged failure to comply with Circular A–76's prohibitions against contracting out certain activities, and would be redressed by a favorable decision. *See Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. at 2136–37. Therefore, individual employees, including plaintiffs Clinkscale and Graham, have standing under Article III.

---

5. The Court rejects defendants' suggestion that plaintiffs are asserting a procedural injury insufficient to confer standing under *Defenders of Wildlife.* That decision did not hold that plaintiffs could never sue on the basis of a procedural violation. Rather, the Supreme Court explicitly stated that "[w]e do not hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of standing." *Defenders of Wildlife,* 504 U.S. at 573 n. 8, 112 S.Ct. at 2143 n. 8.

### B.  Union's Standing

■ An association of individuals suing on behalf of its members must meet additional requirements in order to establish its standing.  NATCA must show that:

(a) its members would otherwise have standing to sue in their own right;

(b) the interests it seeks to protect are germane to the organization's purpose; and

(c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).  It is clear from the foregoing discussion that NATCA's members have standing to sue in their own right.  Further, defendants do not contest that the interests NATCA seeks to protect are germane to its organizational purpose, which is to protect its members' jobs.  Therefore, the only issue is whether the claim asserted or the relief requested by NATCA requires the participation of individual members.

Defendants argue that the suit requires participation of individual members because each member may be faced with a different employment situation after the loss of his or her current job, depending on which option offered by the FAA the member pursues, and whether he or she finds the results satisfactory.  Once again, defendants misconstrue the nature of this suit.  Plaintiffs challenge the FAA's plan to remove them from their current jobs, not the specific options the FAA has offered to employees once the removal is complete.  Since all Level 1 controllers will allegedly lose their jobs as a result of the same procedural violation, there is no need for individual members to participate in the suit.  Determination of whether the FAA violated OMB Circular A–76 does not depend on the individual members' circumstances.  *Cf. United Auto Workers v. Brock,* 477 U.S. 274, 287, 106 S.Ct. 2523, 2531, 91 L.Ed.2d 228 (1986) (issue of whether Secretary of Labor properly interpreted certain provisions of Trade Act did not require District Court to consider individualized circumstances of any aggrieved UAW member).

■ Furthermore, individual participation is unnecessary because NATCA seeks declaratory and injunctive relief, not damages.  Whether an association has established standing to sue on behalf of its members "depends in substantial measure on the nature of the relief sought."  *Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975).  When an "association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.*  Here, the ability of the Court to issue injunctive and declaratory relief does not depend on the individualized circumstances of any member of NATCA.  Unlike an award of damages, which requires inquiry into the extent and nature of each member's injury in order to determine his or her share of damages, *id.* at 515, 95 S.Ct. at 2213–14, the relief sought here applies equally to all affected members.

■ Because neither the claim asserted nor the relief sought by NATCA requires the participation of its individual members, because the interests it seeks to vindicate are germane to its purpose, and because its members have standing to sue as individuals, the Court finds that NATCA has established Article III standing to bring this suit.

### III.  Ripeness

■ Defendants assert that because plaintiffs' alleged injuries are speculative, this case is not ripe for review.  The basic rationale of the ripeness doctrine is "to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).  Determination of ripeness is closely related to determination of standing—"whether the harm asserted has matured sufficiently to warrant judicial intervention." *Warth v. Seldin,* 422 U.S. 490, 499 n. 10, 95 S.Ct. at 2205 n. 10; *see also Adult Video Ass'n v. U.S. Dep't of Justice,* 71 F.3d 563, 567 (6th Cir.1995).

In order to make this determination, courts must weigh several factors: (1) the likelihood that the harm alleged by plaintiffs will ever come to pass; (2) the likelihood that the factual record is sufficiently developed to produce a fair adjudication; and (3) the hardship to the parties if judicial relief is denied at this stage. *Adult Video Ass'n*, 71 F.3d at 568.

First, as discussed above, many FAA Level 1 employees have already lost their jobs, and for those still so employed, the loss of government jobs is not just likely, but "certainly impending." Plaintiffs need not wait until they have lost their jobs to challenge the privatization plan. "One does not have to await consummation of threatened injury to obtain preventive relief." *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923)). Second, the factual record is sufficiently developed for adjudication, since all events relating to the FAA's decision to contract out services at Level 1 towers have already occurred, and the plan is currently being implemented. The questions presented are legal, and do not require further development of facts. Finally, withholding judicial relief until every affected employee loses his or her job would cause hardship to plaintiffs, for whom careers are at stake. Because the privatization plan ensures that FAA Level 1 employees will lose their jobs, plaintiffs' challenge to the plan is ripe for review. *See, e.g., Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1355 (9th Cir.1994) (holding that challenge to agency plan that pre-determined future agency action was ripe for review).

### IV. Conclusion

In sum, the Court finds that both individual plaintiffs and NATCA have standing under Article III to bring this suit, and that their claims are ripe for review. Therefore, reserving judgment on the issue of exhaustion, the Court denies defendants' motion to dismiss the case.

Plaintiffs shall serve and file a response to defendants' motion to dismiss on exhaustion grounds within ten days of this order. Defendants may serve and file a reply within five days after service of the response.

This matter is set for a status call on December 10, 1996 at 2:00 pm, at 3402 Key Tower, 127 Public Square, Cleveland, Ohio.

IT IS SO ORDERED.