AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL–CIO, Appellant,

v.

OFFICE OF PERSONNEL
MANAGEMENT, et al.

NATIONAL TREASURY EMPLOYEES
UNION, Appellant,

v.

Constance HORNER, Director, Office of
Personnel Management.

NATIONAL FEDERATION OF
FEDERAL EMPLOYEES,
Appellant,

v.

Constance HORNER, Director, Office of
Personnel Management.

Nos. 86–5456, 86–5457 and 86–5461.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 19, 1987.

Decided June 26, 1987.

Joseph F. Henderson, with whom Mark D. Roth, Washington, D.C., was on the brief for appellant, American Federation of Government Employees, AFL–CIO, in No. 86–5456.

Elaine D. Kaplan and Lois G. Williams, Washington, D.C., were on the brief for appellant, National Treasury Employees Union, in No. 86–5657.

Edwin H. Harvey, with whom H. Stephan Gordon and Clinton D. Wolcott, Washing-

ton, D.C., were on the brief for appellant, National Federation of Federal Employees, in No. 86–5461.

Peter R. Maier, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty. and William Kanter, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, BORK and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The history of this case is protracted and much of it was reviewed in *National Treasury Employees Union v. Devine*, 733 F.2d 114, 115–16 (D.C.Cir.1984). Briefly, in March, 1983, the Office of Personnel Management ("OPM") proposed new rules for implementing reductions-in-force ("RIFs") that increased the importance of merit (as measured by the results of employee performance evaluations) and decreased the importance of seniority in determining which employees keep their jobs, which get transferred, and which are terminated. OPM also proposed to change the method of determining which employees are entitled to overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (1982) ("FLSA"). Not until July, 1985, however, did these proposed rules go into effect. The delay was caused primarily by riders on congressional appropriation bills preventing OPM from using funds to issue or carry out the rules. The riders expired finally on July 1, 1985, whereupon OPM immediately implemented, over the unions' strenuous objections, a revised version of the rules.

Since July 1983, this matter has been almost continuously under the aegis of the federal courts. In 1983–84, the parties fought over the proper interpretation of the congressional rider—whether it in fact precluded OPM from putting the regulations into effect. That dispute was resolved by our opinion in *Devine*, which held the statutory language effectively, albeit temporarily, precluded OPM from implementing the rules, 733 F.2d at 120. The current phase of the litigation began on June 27, 1985, three days before the ban was due to expire, when the American Federation of Government Employees ("AFGE") filed suit in district court seeking a temporary restraining order preventing OPM from implementing the rules. The next day, the National Federation of Federal Employees ("NFFE") and the National Treasury Employees Union ("NTEU") filed similar actions, all of which the district judge denied from the bench. Although the Court of Appeals reversed, No. 85–5767 (June 29, 1985) (unpublished memorandum and order), Chief Justice Burger vacated the reversal, 473 U.S. 1301, 105 S.Ct. 3467, 87 L.Ed.2d 603 (1985), permitting the rules to go into effect on July 3, 1985. The unions pressed on with their lawsuit in the district court, seeking a preliminary injunction, which the district judge also denied. 618 F.Supp. 1254 (1985). On appeal, we affirmed the district judge. 782 F.2d 278 (1986). The case then went back to the district judge for determination on the merits of the unions' challenge. The unions argued that OPM violated the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1982), by implementing the regulations immediately upon the congressional ban's expiration instead of providing new opportunities for notice and comment, and by failing to consider the unions' objections to the increased use of merit in RIF decisions; that various isolated provisions of the RIF rules conflict with statutory or constitutional requirements; and that OPM's overtime regulations exceed OPM's regulatory authority and are inconsistent with provisions of the FLSA. On cross motions for summary judgment, the district judge granted the government's motion on all issues and dismissed the unions' complaint, No. 85–2092 (June 30, 1986). The unions now appeal.

I.

Appellants contend that OPM's implementation of the regulations on July 3,

1985—immediately after the appropriations rider expired—was unlawful because the agency failed to provide new notice and an opportunity for additional comment after the rider's expiration on July 1, 1985. This was required, appellants argue, because our opinion in *Devine* held the ban rendered OPM's proposed regulations completely "null and void." 733 F.2d 121. Consequently, there were no "proposed regulations" to implement. Appellants also maintain that a new notice and comment period was required because the regulations had become, in some respects, obsolete during the two-year hiatus,[1] and because, as appellants put it, OPM's "sudden implementation" in July, 1985 gave neither federal agencies nor the unions sufficient time to prepare for the rules' adoption.

The district judge found none of these arguments persuasive, and neither do we. Although we did, in *Devine*, describe OPM's regulations as "null and void" while under the congressional ban, our view that this invalidity was merely temporary was plainly stated. We explained that the ban did not "permanently repeal[ ] OPM's authority to implement the disputed regulations," but only prevented OPM from implementing the regulations while Congress studied them. 733 F.2d at 120. We also pointed out that upon expiration, "OPM will be free to take any steps deemed nec-

essary to implement, administer and enforce the regulations...." *Id.* Since OPM had already completed notice and comment proceedings, and in fact had published the rules in final form just two days before Congress imposed its ban, *id.* at 116, implementation could be and was virtually automatic once the ban expired; the unions have identified no additional steps "necessary" to put the rules into effect.

Although admittedly some parts of the regulations were obsolete when implemented in July, 1985, no hardship resulted and OPM quickly cured the defects in a subsequent rulemaking.[2] Nor can it be said that interested parties had insufficient time to prepare for the new regulations; nothing in the rider prevented agencies or private parties from preparing themselves for the effects of the new regulations once the ban expired and, as we have mentioned, it was (or should have been) quite clear to everyone familiar with this rulemaking process that the rules were subject to implementation immediately upon expiration of the ban.

## II.

■ Appellants challenge the regulations' increased emphasis on employee performance evaluation results in determining an employee's retention rights during a RIF.[3] When a RIF occurs, employees are

---

1. The original implementation schedule contained in the proposed rules, for instance, was no longer applicable. Also, during the delay, Congress passed the Civil Service Retirement Spouse Equity Act of 1984, Pub.L. No. 98–615, 98 Stat. 3195, Titles II and III, 98 Stat. 3207, which replaced the old "Merit Pay System" for certain federal employees with a new "Performance Management Recognition System." Certain parts of OPM's regulations relating to the "Performance Management System" accordingly needed updating.

2. OPM republished its rules with new effective dates shortly after the rules were implemented. *See* 50 Fed.Reg. 35,488 (Aug. 30, 1985). During the congressional ban, OPM had promulgated interim regulations in response to Congress' passage of the Civil Service Retirement Spouse Equity Act, *see* 50 Fed.Reg. 11,788 (March 25, 1985), and, after notice and comment, these new regulations went into effect on August 30, 1985. *See* 50 Fed.Reg. 35,488.

3. Under the new regulations, when an agency decides to implement a RIF, it must prepare a register of all employees in each "competitive level" affected by the RIF—all those having the same grade or job classification at the relevant work location. *See* 5 C.F.R. §§ 351.402–351.404 (1986). Employees are listed in order of their "retention standing." Employees are first ranked according to their "tenure group," the highest tenure group consisting of career employees who are not on probation, the next highest consisting of probationary employees, and the lowest consisting of temporary employees. Within each tenure group, employees are further ranked by their "subgroup": disabled veterans get preference over nondisabled veterans, who in turn get preference over non-veterans. Within each tenure group/subgroup, employees are ranked according to their years of service as augmented by credit for their performance. *See* 5 C.F.R. § 351.501 (1986). Employees' performance credits are calculated by attaching a bonus ranging from 0 years to 20 years depending on the results of the employees'

generally laid-off according to their seniority—employees with fewer years of service lose their positions before employees with more years of service. But employees may earn extra years of service credit if they receive high marks in annual performance evaluations. Under the old RIF system, employees could earn up to four "performance credit years" for good work, thereby giving them a greater chance of keeping their jobs during a RIF action. The new regulations increase from four to twenty the maximum number of performance credit years employees may receive as a supplement to their seniority. Appellants contend OPM lacked statutory authority to promulgate the new regulations and, in any event, did so arbitrarily and capriciously because it improperly failed to explain why the particular numbers of credit years selected were the "correct" ones, and failed to consider the unions' complaints that the heightened importance of subjective performance evaluations in the rules would render employment decisions increasingly subject to the unfair or biased evaluations of supervisors.

These objections are insubstantial. Congress gave OPM broad authority to issue regulations governing the release of employees under a reduction-in-force, requiring only that OPM give effect to four factors:

(1) tenure of employment;

(2) military preference ...;

(3) length of service; and

(4) efficiency or performance ratings.

5 U.S.C. § 3502 (1982). Congress thus delegated to OPM the authority to determine the weight to be placed on each factor. Nothing elsewhere in the statute nor in its legislative history suggests any congressional intent to cabin OPM's discretion. That OPM's prior method treated seniority as the most important factor, and that Congress, as appellants argue, expressed no displeasure with that method is simply immaterial. Congress gave OPM broad regulatory authority, including the authority to reconsider and alter its prior balance of factors to diminish the relative importance of seniority.

█ Nor can this aspect of OPM's rulemaking be characterized as "arbitrary and capricious." Contrary to appellants' suggestion, OPM had no obligation to conduct any sort of empirical tests to determine what number of performance credit years was appropriate. This was, after all, a policy decision, not a technical question for which data can provide a mathematically "correct" answer. In this situation, we think it sufficient that OPM identified the need to significantly increase the importance of performance in making RIF decisions, see 48 Fed.Reg. 49,462 (1983), and explained why alternatives other than the formula selected were rejected. See 50 Fed.Reg. 35,506 (1985); 51 Fed.Reg. 318 (1986). The lines drawn as a result of this process may well be, in one sense, "arbitrary" without being "capricious." See American Trucking Associations, Inc. v. ICC, 697 F.2d 1146, 1150–51 (D.C.Cir.1983).

Finally, it cannot be said that OPM gave insufficient consideration to the unions' concerns that favoritism or errors in performance evaluations would prejudice certain employees. Indeed, OPM reduced the maximum number of service credit years from thirty to twenty in response to these complaints. See 51 Fed.Reg. 318 (1986). A more extensive reaction was unnecessary, as it is plain the bulk of the unions' objections allege potential problems associated with the general use of performance evaluations, and not with their increased importance here. The federal government has long employed subjective performance evaluations to help make RIF decisions, see, e.g., 5 C.F.R. 351.504 (1984), and OPM is not required to rehash the arguments for

three most recent performance evaluations, and then determining an average number of bonus points over the three years. See 5 C.F.R. 351.504 (1986). The maximum number of performance credit years an employee can earn is 20 years; this is added to his years of service to determine his retention standing as compared with other employees in his tenure group/subgroup.

and against using such evaluations in every rulemaking.[4]

### III.

Appellants also challenge numerous individual provisions of OPM's regulations. The government objects to these challenges as being unripe for immediate judicial consideration, relying on *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670 (D.C.Cir. 1978):

> [F]or a case to be ripe for review, "[w]hat is required is that the interests of the court and agency in postponing review until the question arises in some more concrete and final form, be outweighed by the interest of those who seek relief from the challenged action's 'immediate and practical impact' upon them."

*Id.* at 672 (quoting *Continental Air Lines, Inc. v. Civil Aeronautics Board*, 522 F.2d 107, 124 (D.C.Cir.1974) (*en banc*).[5] In *Diamond Shamrock*, several chemical manufacturers brought a pre-enforcement challenge to the EPA's issuance of new pollution regulations. These regulations were to be enforced only when chemical manufacturers applied for permits to discharge pollutants into navigable waters. We concluded the petitioners had not shown sufficient interest in immediate review because the regulations would have no "immediate and practical impact" on them until they were actually applied against the petitioners in a permit proceeding. That differed, in our view, from the case of those who "are confronted with a painful choice between immediate compliance with an agency's policy, at great expense, and the risk of serious penalties should their challenge in a later proceeding be unsuccessful." *Diamond Shamrock*, 580 F.2d at 673. We noted that "in the absence of hardship [to the complainants] only a minimum showing of countervailing judicial or administrative interest is needed, if any, to tip the balance against review." *Id.* at 674. And there, we found an administrative interest in postponing review because "[t]he impact of the regulations will depend in part upon their interpretation by the [agency]. *Id.* The court wished to avoid "theorizing about how a rule will be applied and what its effect will be," *id.*, in other words, from "review[ing] the regulations in a vacuum." *Id.*

■ Applying the *Diamond Shamrock* test to the challenges raised here, we be-

---

4. 5 C.F.R. § 351.605 (1986) provides that when all positions in a competitive area will be abolished within a three-month period the agency need not calculate, nor make decisions pursuant to, employees' retention standing rights. Instead, employees may be released solely in order of their tenure group or subgroup. The unions contend this rule violates the requirement of 5 U.S.C. § 3502 that OPM give "due effect" to employee tenure, military preference, seniority, and performance when promulgating regulations. We disagree. When all employees in a competitive area will be released within a relatively short time, it is certainly reasonable to conclude that it would be a waste of resources for an agency to be forced to perform detailed seniority and performance calculations solely to construct a rank ordering of employees' retention rights when those rights are of such little value. OPM is within its authority to conclude that under those limited circumstances, no effect is "due."

We are also not persuaded by appellants' objections to 5 C.F.R. § 351.701 (1986), which specifies employees' bump and retreat rights. Appellants' challenge to certain provisions that were in effect between July 1985 and February 1986, but have since been superseded by new regulations, is quite obviously moot. Appellants also object to one provision currently in force, 5 C.F.R. § 351.701(d) (1986), which limits the "retreat" privileges of federal employees receiving low performance evaluations by permitting them to displace only other employees whose ratings are equally low. Thus, low-rated employees may not displace high-rated employees, but they may still displace other low-rated employees. Although appellants object to this provision primarily because it depends upon performance evaluations to make personnel decisions, this is not by any means, as we discussed above, a flaw. Appellants also appear to argue that this provision improperly eliminates employees' retreat privileges in contravention of 5 U.S.C. § 3502(c), which provides that employees whose performance ratings are above "unacceptable" are "entitled to be retained in preference to other competing employees." But, in fact, the challenged regulation does preserve employees' fundamental privilege of retreating; it merely limits the class of employees into whose positions the low-rated employee may retreat.

5. This statement of the ripeness inquiry fairly reflects the seminal ripeness standard established in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

lieve that two are not ripe for immediate review. Appellants challenge 5 C.F.R. 351.505(b) (1986), which excludes unions from the list of those eligible to inspect agency records pertaining to employees' retention standing, arguing the regulation conflicts with a statutory requirement, administered by the Federal Labor Relations Authority ("FLRA"), that requires agencies to make available to unions representing federal employees data which is "necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining." 5 U.S.C. § 7114(b)(4) (1982).[6] As in *Diamond Shamrock*, the appellants here have little need for immediate review. The regulation will have no "immediate and practical impact" on the appellants unless and until an agency actually invokes this regulation to deny retention records to a union in a specific bargaining context. Moreover, it is difficult to decide whether retention standing records are necessary to the collective bargaining process in the purely theoretical context of this case. We can conceive of a range of factual settings, some of which are more and some less conducive to this claim. It would therefore better serve judicial review to wait until the appellants come to us complaining of an actual situation in which withholding of these records has intruded upon a union's collective bargaining responsibilities so that we may then determine whether, in fact, regulation intrudes upon the union's statutory collective bargaining rights.

■ We also decline to address appellants' contention that OPM's regulations are constitutionally flawed because they fail to provide employees adversely affected by a RIF a pre-decisional hearing—a right to appeal their impending transfer or dismissal before it takes place. Appellants rely for this argument on *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), which held that when an employee has a "property right in continued employment," *id.* at 538, 105 S.Ct. at 1491, he is entitled to "constitutionally adequate procedures." *Id.* at 541, 105 S.Ct. at 1493. Whether the Constitution requires that these procedures include a pre-termination hearing turns on "a balancing of the competing interests at stake," *id.* at 542, 105 S.Ct. at 1494, such as "the private interests in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens." *Id.* at 542–43, 105 S.Ct. at 1494. Examining the interests of the employee, the Court in *Loudermill* found that an employee terminated for cause had an important interest in a pretermination hearing because of the "severity of depriving a person of a means of livelihood," *id.* at 543, 105 S.Ct. at 1494, the stigma associated with a for-cause termination, and because dismissals for cause often involve factual disputes that should be heard before the employee suffers the loss of his property interest. *Id.* On the other hand, the Court found the employer's interest in expediency of minimal importance in terminations for cause because delays need not be lengthy, the employer shares the employee's interest in avoiding erroneous terminations, and the employer may continue receiving the benefits of the employee's labors during the pendency of the appeal. *Id.* at 544–45, 105 S.Ct. at 1495.

Because *Loudermill* involved a termination for cause, not a reduction-in-force, it is by no means obvious that a property interest in continued employment is even implicated here. But assuming *arguendo* that a property interest in continued employment does survive a reduction-in-force, whether a pre-termination hearing is constitutionally required necessarily turns in part on a balance between employee stigma and employer interests. Unlike a termination

---

**6.** A union adversely affected by an agency's withholding of records under this regulation could, it would seem, challenge that action under the Federal Labor Relations Act, in which case the Authority, not the courts, would have primary jurisdiction to decide whether, in the circumstances of the case, the withholding is an unfair labor practice under 5 U.S.C. § 7116(a)(8) (1982). *See* 5 U.S.C. § 7118 (1982); *Clark v. Mark*, 590 F.Supp. 1, 5–8 (N.D.N.Y. 1980). Even if appellants' challenge to this regulation were ripe under *Diamond Shamrock*, we suspect it would be barred under the primary jurisdiction doctrine.

for cause, which is inherently stigmatizing because it reflects adversely upon the employee, a RIF termination does not clearly label a laid-off worker. Indeed, appellants do not even argue that RIF terminations *automatically* stigmatize employees— their concern is with those RIF terminations based in part on less favorable performance evaluations. But, surely there would be cases under the new regulations where an employee would lose his position in a RIF, yet suffer absolutely no stigma. We think we would be on "surer footing," therefore, if we wait for a specific employee's challenge to his layoff and then determine if any stigma associated with that layoff gives rise to a pretermination hearing right. *See Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967).

Given the dependency of appellants' constitutional claim on the facts of an individual employee's case, the interest of the court in postponing review under the *Diamond Shamrock* ripeness test is substantial. Furthermore, we believe OPM's failure to provide pre-termination hearing rights has little "immediate and practical impact" on federal employees. That federal employment may in some sense be "less valuable," as appellants claim, in the absence of such hearing rights is an insufficient consideration, given the current abstract posture of this challenge, to justify immediate review.

### IV.

■ Appellants challenge the following OPM regulation, which sets forth the appeal rights of employees subject to a reduction-in-force:

> An employee who has been furloughed for more than 30 days, separated, or demoted by a reduction-in-force action may appeal to the Merit Systems Protection Board. *Unless the presiding official determines that there are material issues of fact in dispute that would*

*require a hearing for resolution, the review of an agency action shall be confined to the written record.*

5 C.F.R. § 351.901 (1986) (emphasis added). Appellants assert that OPM, by regulation, has sought to undermine a statutory guarantee that all employees having an MSPB appeal right are entitled to a full, oral hearing:

> An employee ... may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, *or regulation.* An appellant shall have the right—
>
> (1) to a hearing for which a transcript will be kept;
>
> ....
>
> Appeals shall be processed in accordance with regulations *prescribed by the Board.*

5 U.S.C. § 7701(a) (1982) (emphasis added). The district judge declined to resolve the merits of appellants' complaint, declaring the issue unripe and finding that because RIF terminations are normally based solely on mathematical calculations, a traditional fact-finding hearing would be unnecessary, 618 F.Supp. at 1263. *See also* No. 85–2092 (June 30, 1986), at 5. In contrast to the two issues discussed above, we believe this question is ripe for review because its resolution does not turn on the facts of a particular case—there exists a plain legal flaw in OPM's rulemaking.

OPM has reached beyond its designated statutory authority by issuing a regulation that purports to instruct the MSPB how to conduct personnel appeals.[7] The only provisions cited as authority for this regulation are 5 U.S.C. §§ 1302, 3502 (1982). *See* 50 Fed.Reg. 35,507 (1985). Yet neither of these sections explicitly authorize the regulation at issue here.[8] By contrast, the stat-

---

7. To be sure, OPM's regulation does not totally bind the MSPB; discretion is given to the MSPB presiding official to conduct a full hearing, but only if he determines there are material facts in dispute.

8. Section 1302 defines four different kinds of regulations OPM may prescribe: those pertaining to "examinations for the competitive ser-

vice," 5 U.S.C. § 1302(a) (1982), those ensuring that "preference eligibles" receive due preference in personnel actions in both the "competitive" and "excepted" service, 5 U.S.C. §§ 1302(b)–(c) (1982), and those pertaining to political activity of certain state or local employees, 5 U.S.C. § 1302 (d) (1982). Section 3502 grants OPM authority to prescribe regulations

utory grant to the MSPB of the right to prescribe its *own* rules for processing appeals could not be more clear. *See* 5 U.S.C. § 7701 (1982). OPM contends, however, that since the right of employees to appeal RIF decisions is granted solely by OPM regulation, OPM has the authority to limit the procedures under which that right may be exercised. But that seems plainly wrong. Congress' specific delegation to MSPB of autonomy over its own appellate procedures compels just the opposite conclusion: if OPM chooses to use the MSPB for dispute resolutions, it must take that statutory device as it finds it. We therefore direct the district court to enter summary judgment for appellants and vacate 5 C.F.R. § 351.901 (1986).[9]

## V.

Appellants' final challenge is to OPM's regulations governing payment of overtime compensation to federal workers as exceeding OPM's statutory authority and as violating the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (1982). The FLSA requires employers to pay one- and one-half times the regular rate of pay to employees for any work performed in excess of 40 hours in a week. *See* 29 U.S.C. § 207(a) (1982). This rule does not apply, however, to "exempt" employees such as those employed "in a bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a) (1982). Before 1974, moreover, the FLSA did not apply to federal employees, whose overtime entitlements were governed instead solely by civil service statutes, *see* 5 U.S.C. § 5542 (1982), administered by OPM's predecessor, the Civil Service Commission. Under these statutes, entitlement to overtime payment was determined primarily by an employee's General Schedule ("GS") rating.

In 1974, Congress amended the FLSA to include employees of the federal government, Pub.L. No. 93–259, 88 Stat. 55 (pertinent part codified at 29 U.S.C.

§ 203(e)(2)(A) (1982), despite the Civil Service Commission's objections that existing civil service overtime laws were adequate and that FLSA coverage would simply confuse administration of the two separate overtime provisions. *See* Fair Labor Standards Amendments of 1974, H.R.Rep. 913, 93d Cong., 2d Sess. 28 (1974), U.S.Code Cong. & Admin.News 1974, p. 2811 (hereinafter "House Report").

Congress resolved the potential conflict between the civil service system and the FLSA by including federal employees within the coverage of the Act, *see* House Report at 28, and giving the Civil Service Commission [now OPM] the authority "to administer the provisions [of FLSA] with respect to any individual employed by the United States...." 29 U.S.C. § 204(f) (1982). The House Report indicates, however, that in resolving any conflicts between the two, "the Commission will administer the provisions of the [FLSA] in such a manner as to assure consistency with the meaning, scope, and application established by the rulings, regulations, interpretations, and opinions of the Secretary of Labor which are applicable in other sectors of the economy." House Report at 28. Emphasizing the point, the House Report goes on to say "[t]he provisions of the [FLSA amendments] would leave the premium pay provisions of Title 5, United States Code, in effect *to the extent that they are not inconsistent with the Fair Labor Standards Act.*" *Id.* (emphasis added).

Appellants challenge regulations promulgated by OPM pursuant to its authority to "administer" the FLSA in the civil service. Among other provisions, the regulations establish a rebuttable presumption that any federal employee classified at GS-11 or higher (regardless of his actual job duties) is not eligible to receive overtime pay, 5 C.F.R. § 551.203 (1986). Appellants raise two objections to OPM's actions: that OPM

---

for the release of employees during a RIF, but does not explicitly speak to such employees' appeal rights.

**9.** This disposition makes it unnecessary to address appellants' claim that *Crispin v. Dep't of Commerce,* 732 F.2d 919 (Fed.Cir.1984), implicitly circumscribes OPM's authority to limit the availability of a full MSPB hearing.

had no statutory authority to promulgate formal overtime regulations; and that, in any event, this regulation conflicts with the Department of Labor's interpretation of the FLSA, which establishes only narrow exemptions to overtime eligibility for executive, administrative, and professional employees, and recognizes a presumption that employees are eligible for overtime compensation.

■ Whether, as the government argues, OPM has authority to issue formal substantive regulations, or must instead, as appellants contend, confine itself to issuing interpretive rules and acting as a management advisor, turns on what Congress meant by giving the Civil Service Commission authority to "administer" the FLSA. "What is important is that [we] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown,* 441 U.S. 281, 308, 99 S.Ct. 1705, 1720, 60 L.Ed.2d 208 (1979). To be sure, the plain language of the statute gives less than a conclusive picture of Congress' intent; the power to "administer" may or may not incorporate the power to regulate. *See* BLACK'S LAW DICTIONARY 41 (5th ed. 1979) (defining "administer" as meaning "to manage or conduct.") But a colloquy between Representative John Dent, Chairman of the House Committee on Labor and Education, which reported the FLSA amendments, and Representative David Henderson, Chairman of the House Committee on Post Office and Civil Service, whose legislative bailiwick included the civil service, shows that the question before us received congressional consideration:

Mr. HENDERSON: Mr. Chairman, I would like to inquire of the gentleman from Pennsylvania the intent of the Education and Labor Committee of their language on page 28 of House Report 93–913 regarding the Civil Service Commis-

sion's responsibilities under the Fair Labor Standards Act. [Language quoted *supra* at 16–17]. The bill provides that the Civil Service Commission is authorized to *administer* the provisions insofar as Federal employees are concerned. The language in the report at page 28 seems to be in conflict with the bill. *I assume that the Commission will have the authority to determine who in the Federal work force is covered and how the existing provisions of [civil service] law on overtime for Federal employees are going to be administered when in conflict with the provisions of the Fair Labor Standard Act.*

. . .

Mr. DENT: Mr. Chairman, the gentleman is absolutely correct. . . .

120 Cong.Rec. 7,335 (March 20, 1974) (emphasis added). Although, admittedly, this exchange does not explicitly state that Congress expected OPM to promulgate substantive rules, as opposed to interpretive rules or guidelines, it does show that Congress intended OPM to have a great deal of authority to determine how the FLSA would be administered in the civil service. Applying the *Chrysler* standard, we think it reasonable to conclude that Congress contemplated OPM would exercise its administrative authority by engaging in the common agency practice of issuing substantive rules.[10]

■ In promulgating regulations, OPM is nevertheless obliged to exercise its administrative authority in a manner that is consistent with the Secretary of Labor's implementation of the FLSA. *See* House Report at 28. When the civil service and FLSA systems conflict, OPM must defer to the FLSA so that any employee entitled to overtime compensation under FLSA receives it under the civil service rules. FLSA, we reiterate, contains a presumptive rule that employees who work more than

---

**10.** Appellants observe that Congress has, on other occasions, been more explicit in its grant to OPM of regulatory authority. They urge us to assume the lack of such explicit authority here indicates Congress' desire not to grant OPM regulatory authority over FLSA matters. While such contrasting degrees of specificity may be indicative of congressional intent in certain situations, (particularly where more specific grants of regulatory authority appear elsewhere in the same Act), we are not persuaded that Congress intended by its language to deny OPM regulatory authority.

forty hours in a week must receive overtime compensation. *See* 29 U.S.C. § 207 (1982). Although employees who are determined to be executive, administrative, or professional are exempt from overtime, 29 U.S.C. § 213(a)(1) (1982); 29 C.F.R. § 541 (1986), the burden is on the *employer* to demonstrate the employee is in fact exempt. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Clark v. J.M. Benson Co., Inc.,* 789 F.2d 282, 286 (4th Cir.1986).

■ The regulations challenged here conflict in important ways with the FLSA. To be sure, OPM's new regulations purport to exempt, as does the FLSA, only tightly defined executive, administrative, and professional employees from overtime eligibility. *See* 5 C.F.R. §§ 551.204, 551.205, 551.-206 (1986). But these provisions are completely undermined by another regulatory section which states that "[a]ny employee properly classified at GS–11 or above [without regard to the nature of his duties] ... shall be presumed to be exempt [from overtime eligibility]." 5 C.F.R. § 551.203(c).

The regulations also purport to comply with the FLSA principle that employees are presumed eligible for overtime, affirming that "[t]he burden of proof [that an employee is exempt from overtime eligibility] rests with the agency that asserts the exemption." *See* 5 C.F.R. § 551.202(b) (1986). But this provision too is modified by another section that provides: "[a]n agency that properly classifies an employee at GS–11 or above shall be deemed to have satisfied the burden of proof for asserting an exemption." 5 C.F.R. § 551.203(c). Thus, while pledging fidelity to the FLSA in the "general principles" section of its overtime rules, OPM has, in the operative sections of those rules, undercut these very principles.

The conflict between the regulations and the FLSA is quite apparent in the case of the GS–11 employee who works as a skilled technician. Under the FLSA, technical em-

ployees are eligible for overtime, and OPM in the past recognized as much. *See* Federal Personnel Manual System Letter 551–7 21 (July 1, 1975). Yet the GS–11 grade encompasses employees who perform technical duties. *See* 5 U.S.C. § 5104(11) (1982). Under the new regulations, all GS–11 employees (including technicians) are presumed ineligible for overtime compensation, and must, if their employing agency invokes the presumption to deny them overtime payment, file a complaint with OPM or file suit in the United States District Court. *See* Federal Personnel Manual System Letter 551–9 2 (March 30, 1976). Although OPM insists few government employees will suffer such inconvenience, and contends the presumption against their overtime eligibility is "easily rebuttable," OPM's position seems disingenuous. The regulation appears designed to make it difficult for the employee to rebut the presumption—at least to the satisfaction of the employing agency. Since the presumption appears to guide or direct the agency to act inconsistently with the FLSA and places an unwarranted and, at minimum, confusing burden on the employee, section 551.203(c) is flawed and must be vacated as inconsistent with the "meaning, scope, and application" of the FLSA.

■ OPM's regulation defining "executive" employees, 5 C.F.R. § 551.204, is also susceptible to a more expansive interpretation than the comparable Department of Labor regulation, 29 C.F.R. § 541.1 (1986). For example, under the Labor Department's regulation, for an employee to be exempt from overtime, he must "customarily and regularly" direct the work of others and must manage the entire "enterprise" in which he is employed, or at least a "department" thereof. OPM's regulations contain no such limitations. Thus, under the most straightforward reading of section 551.204, this regulation is inconsistent with the Labor Department's definition of "executive" employees, and is therefore also vacated.[11]

11. Appellants also object to OPM's failure to include in its definition of "executive" employee, 5 C.F.R. § 551.204, a requirement that such employees spend at least 50 percent of their

time supervising other employees. Yet while the comparable DOL regulation, 29 C.F.R. § 541.103 (1986) does establish this 50 percent figure as a *guideline* for identifying executive

The district court's decision is, therefore,

*Affirmed in part, reversed in part.*

employees, it is not a hard-and-fast requirement. We see no specific inconsistency between the OPM and DOL regulations here.

Since appellants' final objection, that OPM's regulation does not limit the "executive employ-ee" exemption to salaried employees, does not point to specific contradictory FLSA regulations, we shall not entertain it.